IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| *Rogelio Ramos, Jr.*, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 1:25-cv-1457 |
| | § | |
| VS. | § | |
| | § | |
| *Jordan Ford, Ltd.*, *Franklin Miranda*, | § | |
| *Robert Zimmerman*, and *Casey* | § | |
| *Ogletree*, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## Plaintiff's Original Petition

### I.    Introduction: Procedural Background & Status

1.    Plaintiff Rogelio Ramos, Jr. (hereinafter "Plaintiff" or "Mr. Ramos") brings this lawsuit against Defendant Jordan Ford, Ltd. (hereinafter "Jordan Ford") to recover money damages and associated relief for violation of Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866; and against Defendants Franklin Miranda, Robert Zimmerman, Casey Ogletree, Marc Cross, Maurice Trumpeter, and Nick Thurmond to recover money damages and associated relief for violation of Section 1981 of the Civil Rights Act of 1866.

2.    Personal jurisdiction is proper for Mr. Ramos since Texas is his domicile. Personal jurisdiction is proper for all Defendants because the majority of the

_____

Plaintiff's Original Petition                         Page 1

events related to this suit occurred within Texas, which gives this Court specific personal jurisdiction to hear this complaint.

3. The Court has subject matter jurisdiction over this case via Federal Question Jurisdiction since the action arises under the Civil Rights Act of 1964 and the Civil Rights Act of 1866, which are both federal statutes.

4. Venue is proper in the United States District Court for the Western District of Texas Austin Division under 42 USCS § 2000e-5(f)(3) because this district is within the State in which the unlawful unemployment practices alleged took place.

5. In accordance with the requirements of 42 USCS § 12117, Plaintiff has exhausted all administrative remedies available to him in connection with his Title VII claims. Plaintiff has filed complaints with the United States Equal Employment Opportunity Commission and the Texas Workforce Commission's Civil Rights Division, resulting in a finding of discrimination from the United States EEOC. Plaintiff received his Notice of Right to Sue Letter from the US EEOC on June 11, 2025, after the EEOC conciliation process failed.

## II.     Factual Background

6. On or about September 2021, Mr. Ramos began his employment as a Sales Representative in the new car department at Jordan Ford in San Antonio, TX.

7. As part of his employment with Jordan Ford, Mr. Ramos was part of a work-related text-message group chat with other employees. Among the employees in this group chat were Finance Managers Franklin Miranda and Robert Zimmerman;

---

Plaintiff's Original Petition                              Page 2

Mr. Miranda was Mr. Ramos' direct supervisor. These two managers would spearhead the campaign of harassment against several co-workers, including Mr. Ramos. This campaign included racist comments made towards Mr. Ramos and sexually explicit comments towards Mr. Ramos and others.

8.    The employee group chat contains numerous derogatory comments targeting Mr. Ramos for his race. When another employee asked, "Where's Roger?", Mr. Miranda replied "Immigration picked him up." In a separate exchange, Mr. Miranda referred to the city of Los Angeles as "[t]he mother of all wetback[s]. . . ." In another exchange, Mr. Miranda told another Hispanic employee "Speak [E]nglish damn it." Mr. Zimmerman replied in support, "Yes dammit." Mr. Miranda followed up with another message saying, "crazy immigrants." Mr. Zimmerman responded with a crying with laughter emoji.

9.    The group chat is also filled with numerous sexually explicit comments directed at Mr. Ramos and others. In October of 2022, Mr. Miranda posted several edited images of Mr. Ramos, including one of Mr. Ramos' head edited onto a Halloween costume of a "Gay Guy". In October of 2022, Mr. Miranda posted a photograph of cars stacked onto a truck for transport with the caption "[I]t looks like Roger's friends from San Francisco[.] All ON TOP OF EACH OTHER [sic]." In November of 2022, Mr. Miranda posted an edited image of Mr. Ramos' head on top of a shirtless man waving a rainbow flag with the caption "GO DODGERS." Mr. Miranda said this was "Rodger [sic] at the Dodger's Parade."

10.     Mr. Ramos made complaints regarding the harassment to Mr. Zimmerman, who said that Mr. Miranda was "just being himself." Mr. Ramos then escalated his complaints to the General Manager, Casey Ogletree, who also did nothing to address the harassment. Mr. Ramos asked Mr. Ogletree to transfer him out of the new car department to the pre-owned car department so he could escape Mr. Miranda's harassment. Mr. Ogletree denied the request.

11.     On December 16, 2022, Mr. Ramos attended a mandatory meeting at Jordan Ford from 8:00 AM through 8:45 AM. Following this meeting, Mr. Ramos left the premises to attend to his pregnant wife, as he was scheduled to begin work that day at noon.

12.     Just after 9 AM, Mr. Miranda sent a text to the group chat announcing that there was another mandatory team meeting starting at 10 AM. Mr. Ramos replied in the group chat that he would not attend the meeting and would instead arrive at work later in the day, as scheduled. Mr. Miranda told Mr. Ramos that he needed to see him when he got to work later that day. Mr. Ramos replied that "all you have to do is say ok to me not being there[.]" Mr. Miranda replied, "We'll see about that Roger[.]" Mr. Ramos then replied that he would see Mr. Miranda in HR "[f]or all the gay slander." Mr. Miranda responded, "Sure[.]"

13.     When Mr. Ramos arrived, Mr. Miranda complained that he had been disrespected by Mr. Ramos when he refused to come to the meeting. Mr. Ramos explained that he found this ironic considering that he had been the victim of Mr.

Miranda's harassment for months. Mr. Ramos told Mr. Miranda that respect had to be a two-way street. After this conversation, Mr. Ramos worked most of his shift without interruption.

14.    At about 7:45 PM, Mr. Miranda brought Mr. Ramos and Mr. Zimmerman into his office to have a private meeting. In this meeting, Mr. Miranda informed Mr. Ramos that he had reported Mr. Ramos to Casey Ogletree, Ken Banks, and Marc Cross, alleging that Mr. Ramos had a bad attitude and was a bad employee.

15.    After the meeting, at 8:00 PM, Mr. Ramos sent a message to the group chat complaining about this retaliatory report by Mr. Miranda, stating "Franklin's a rat […] He ratted me out to Casey and Ken."

16.    Jordan Ford terminated Mr. Ramos' employment the next day, December 17, 2022, stating that the reason for his termination was Mr. Ramos calling Mr. Miranda a "rat" in the group chat, checking boxes on the employee discipline form for "Breach of Company Policy," "Conduct," and "Insubordination."

17.    On December 20, 2022, Mr. Ramos was contacted via email by various members of Jordan Ford's management ordering him to return "deal jackets," paper packets containing sensitive client information. Jordan Ford alleged that Mr. Ramos had taken several deal jackets from the dealership when he left the premises on December 17, and had failed to return them. On the morning of December 21, 2022, Mr. Ramos denied having any of these jackets in his possession, but Jordan Ford continued

---

Plaintiff's Original Petition                    Page 5

to insist that he return them, withheld payment of earned compensation from Mr. Ramos, and threatened to contact the police if the jackets were not returned.

18.     At approximately 3 PM on December 21, 2022, Jordan Ford contacted the Live Oak Police Department, accusing Mr. Ramos of stealing the deal jackets and refusing to return them. A police officer came to the dealership and took a statement from Casey Ogletree. Mr. Ogletree also relayed a statement from Nicholas Thurmond, who claimed to have spoken with Mr. Ramos over the phone on December 20, and to have received therein a confession from Mr. Ramos of having destroyed the deal jackets. The incident was later closed by the police without charges filed against Mr. Ramos.

### III.    First Claim for Relief – Title VII of the Civil Rights Act of 1964 against Jordan Ford, Ltd.

#### A.  Hostile Work Environment

19.     To prevail on a claim under Title VII of the Civil Rights Act of 1964, the plaintiff must prove that they were "discriminate[d] against" with respect to their "compensation, terms, conditions, or privileges of employment" on the basis of their "race, color, religion, sex, or national origin." 42 USCS § 2000e-2(a)(1). A plaintiff can establish a Title VII claim by proving that the discrimination has created a "hostile" or "abusive" work environment. *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995) (discussing sex-based discrimination); *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) (discussing race-based

_____

Plaintiff's Original Petition                              Page 6

discrimination). A hostile work environment under Title VII is characterized as having "(1) racially [or sexually] discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive work environment." *Id.*

20.    In the Fifth Circuit, when "determining whether a working environment is hostile or abusive, all circumstances must be considered, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.*

21.    Mr. Ramos is a Hispanic male who faced recurring ridicule and insults based on his ethnicity and gender. The ridicule and insults were so pervasive and severe that they altered the conditions of his employment and created an abusive work environment. The conduct was humiliating, conducted frequently, and unreasonably interfered with Mr. Ramos' work performance – Mr. Ramos was required to read the group chat in which the harassment occurred as it was also where he would receive critical work-related information.

22.    White Sales Representatives who reported to Franklin Miranda as their supervisor were not subjected to harassment of the same intensity or persistence based on their race, ethnicity, or sex.

23.    An employer's potential vicarious liability in a workplace harassment claim depends on the status of the harasser. If the harasser is a co-worker

_____

of the victim employee, the employer may be vicariously liable only if it was "negligent in controlling working conditions." *EEOC v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 452 (5th Cir. 2013). If the harasser is a supervisor, an employer may be held vicariously liable for the workplace harassment of an employee if (1) the employee is a member of a protected class, (2) the harassment was unwelcome, (3) the harassment was based on the employee's membership of a protected class, and (4) the harassment affected a term, condition, or privilege of employment. *Id.* at 453. An employee is considered a "supervisor" if "he or she is empowered by the employer to take tangible employment actions against the victim." *Id* at 452-53.

24.    Franklin Miranda, Casey Ogletree, and Robert Zimmerman were all in supervisory positions relative to Mr. Ramos, as each individually had authority granted to them by Jordan Ford to take tangible employment actions against Mr. Ramos. Jordan Ford thus should be held vicariously liable for the actions and omissions of these individuals.

25.    Mr. Ramos is a member of a protected class because of his race, ancestry, and ethnicity; he is Latino or Hispanic.

26.    The harassment Mr. Ramos was subjected to was unwelcome, as shown by his requests for the conduct to stop and his previous reporting of the problem to Robert Zimmerman.

27.     The harassment Mr. Ramos faced was explicitly based on his race, and it directly affected the conditions of his employment because it was conducted in a series of work-related group text messages.

### B. Retaliation

28.     Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to "discriminate against any of his employees [...] because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 USCS § 2000e-3.

29.     In the Fifth Circuit, to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate three elements: (1) The plaintiff engaged in activity protected by Title VII; (2) An adverse employment action occurred; and (3)A causal link exists between the protected activity and the adverse employment action. *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019); *Royal v. CCC&R Tres Arboles, L.L.C*, 736 F.3d 396, 400 (5th Cir. 2013).

30.     Protected activity under Title VII is defined as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Lewis v. Bd. of Supervisors of La. State Univ.*, 134 F.4th 286, 295 (5th Cir. 2025).

31.     Mr. Ramos engaged in protected activity under Title VII when he told Mr. Miranda that he would be reporting the history of sexual harassment by Mr. Miranda to HR.

32.     Mr. Ramos was terminated from his position with Jordan Ford the day after he engaged in the protected activity. The close temporal proximity between his engaging in the protected activity and the adverse employment action taken against him, as well as the specific facts alleged by Mr. Ramos, support a causal connection between Mr. Ramos' protected activity and his termination.

**IV.    Second Claim for Relief – Section 1981 of the Civil Rights Act of 1866 against Jordan Ford, Ltd.; Franklin Miranda, Robert Zimmerman; Casey Ogletree; Marc Cross; Maurice Trumpeter; and Nick Thurmond**

33.     To prevail on a claim under Section 1981 of the Civil Rights Act of 1866, the plaintiff must prove that (1) their ability to "make and enforce contracts," was impaired, (2) the impairment was solely due to discrimination based on their race, "ancestry," or "ethnic characteristics," and (3) the discrimination was intentional. 42 USCS § 1981; *St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987).

34.     The phrase "make and enforce contracts" has been defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). It is also well established that § 1981 "affords a federal remedy

_____

Plaintiff's Original Petition                                    Page 10

against discrimination in private employment on the basis of race." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975).

35.    The Fifth Circuit has recognized that "an employee's claim that he was subjected to retaliation because he complained of race discrimination is a cognizable claim under § 1981." *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 339 (5th Cir. 2003).

36.    Mr. Ramos brings his claims under Section 1981 against all Defendants on the basis of both direct discrimination and retaliation.

## A. Jordan Ford

37.    Mr. Ramos' ability to enforce the terms of his employment relationship with Jordan Ford was impaired by Jordan Ford when its employees in a supervisory role with respect to Mr. Ramos (*see respondeat superior* analysis *supra*) engaged in a pattern of racial harassment against him, but for which he would not have engaged in protected activity objecting to that racial harassment and therefore would not have been retaliated against through his termination..

38.    Mr. Ramos' ability to enforce the terms of his employment relationship was also impaired by Jordan Ford when they retaliated against him for his engagement in protected activity under Section 1981.

39.    The discrimination was intentional: the racial harassment was not mere stray remarks, quickly apologized for and then quickly discontinued; it was

_____

an intentional pattern of harassment against Latino and Hispanic employees, using terms long recognized as racially offensive.

**B. Franklin Miranda**

40.    Mr. Ramos' ability to enforce the terms of his employment relationship with Jordan Ford was impaired by Franklin Miranda when Mr. Miranda engaged in a pattern of racial harassment against Mr. Ramos, but for which Mr. Ramos would not have engaged in protected activity objecting to that racial harassment and therefore would not have been retaliated against through his termination.

41.    Mr. Ramos' ability to enforce the terms of his employment relationship was also impaired by Franklin Miranda when he retaliated against him for his engagement in protected activity under Section 1981, reporting Mr. Ramos to Jordan Ford HR and recommending his termination.

42.    Mr. Ramos' ability to enjoy his employment with Jordan Ford was severely impaired due to the harassment he faced in the work group chat that specifically targeted his ethnicity. This harassment and disparate treatment was the sole cause of this impairment.

43.    On information and belief, Franklin Miranda continues to send racially and sexually harassing messages in the group chat, despite having terminated his employment relationship with Jordan Ford.

## C. Robert Zimmerman

44.     Mr. Ramos' ability to enforce the terms of his employment relationship with Jordan Ford was impaired by Robert Zimmerman when Mr. Zimmerman joined in the racial harassment, sending approving messages and emojis in response to Mr. Franklin, and when Mr. Zimmerman refused to take any action to prevent Mr. Miranda from continuing this behavior after Mr. Ramos reported the behavior to him.

45.     These actions from Mr. Zimmerman limited Mr. Ramos' ability to enjoy the terms of his employment with Jordan Ford through chilling Mr. Ramos' desire to report further infractions and through fostering an atmosphere of management not caring about racial discrimination.

46.     Mr. Ramos' ability to enforce the terms of his employment relationship was also impaired by Robert Zimmerman when he refused to intervene in the decision to terminate Mr. Ramos in retaliation for his protected activity under Section 1981.

## D. Casey Ogletree

47.     Mr. Ogletree impaired Mr. Ramos' ability to enjoy the benefits of his employment at Jordan Ford because he was aware of the racially discriminatory and hostile environment within the Jordan Ford group chat and did not take any remedial action, even denying Mr. Ramos's request to be transferred to another department.

_____

48.    Additionally, Mr. Ogletree kept Mr. Ramos' commissions from August through October of 2022, and refused (until ordered otherwise by the Texas Workforce Commisison) to pay Mr. Ramos his owed commissions after the termination of Mr. Ramos' employment with Jordan Ford. By contrast, Mr. Ogletree paid missing commissions to a white employee as soon as the problem was reported.

49.    Since there is evidence of Mr. Ogletree treating a white employee differently than Mr. Ramos in comparable circumstances, Mr. Ogletree's actions can reasonably be interpreted as being based solely on Mr. Ramos' ethnicity.

## V.    Damages

## A.  Jordan Ford

### i. Compensatory Damages

50.    Under Plaintiff's Title VII claim against Jordan Ford, Plaintiff seeks compensatory damages in the form of back pay, including pre- and post-judgment interest, pursuant to 42 USCS § 1981a(a)(1).

51.    Plaintiff additionally seeks from Jordan Ford compensatory damages for future economic losses and mental anguish. These damages are subject to the statutory limit for a company of Jordan Ford's size under 42 USCS § 1981a(b)(3)(A), which, to the best of Plaintiff's knowledge, would be a limit of $200,000, based on their having more than 200 and fewer than 501 employees.

52.    Under Plaintiff's Section 1981 claim, Plaintiff seeks compensatory damages from Jordan Ford for back pay, front pay, and mental anguish.

_____

### ii. Punitive Damages

53.     Under Plaintiff's Title VII claim against Jordan Ford, Plaintiff seeks punitive damages against Jordan Ford because of Jordan Ford's malicious or recklessly indifferent discriminatory practices, pursuant to 42 USCS § 1981a(b)(1).

54.     Plaintiff requests punitive damages be awarded against Jordan Ford such that the combination of covered compensatory and punitive damages awarded to Plaintiff reaches the statutory cap of $200,000.

55.     Under Plaintiff's Section 1981 claim against Jordan Ford, Plaintiff seeks any punitive damages available to him.

### B.  Franklin Miranda

56.     Under Plaintiff's Section 1981 claim, Plaintiff seeks compensatory damages from Franklin Miranda for back pay, front pay, and mental anguish.

57.     Under Plaintiff's Section 1981 claim against Franklin Miranda, Plaintiff seeks any punitive damages available to him.

### C.  Robert Zimmerman

58.     Under Plaintiff's Section 1981 claim, Plaintiff seeks compensatory damages from Robert Zimmerman for back pay, front pay, and mental anguish.

59.     Under Plaintiff's Section 1981 claim against Rober Zimmerman, Plaintiff seeks any punitive damages available to him.

### D. Casey Ogletree

60.    Under Plaintiff's Section 1981 claim, Plaintiff seeks compensatory damages from Casey Ogletree for back pay, front pay, and mental anguish.

61.    Under Plaintiff's Section 1981 claim against Casey Ogletree, Plaintiff seeks any punitive damages available to him.

### E.  Joint and Several Liability

62.    Plaintiff seeks from all Defendants, jointly and severally, reasonable attorney's fees and costs of court, as authorized under 42 USCS § 1988.

### VI.    Conclusion & Prayer for Relief

63.    For the foregoing reasons, Plaintiff respectfully prays that the Court will conduct a trial on Plaintiff's claims for violations of Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866; that the Court will award Plaintiff his actual damages as found by the Court; that the Court will also award Plaintiff any punitive or exemplary damages as found by the Court; and that the Court will enter money judgment in favor of the Plaintiff, against the Defendants, for such actual and punitive damages, plus pre- and post-judgment interest and costs of court and attorney's fees; that the Defendants will take nothing on any counterclaim;

_____

and that the Court will award Plaintiff such other and further relief, at law or in equity, to which he may show himself justly and equitably entitled.

Respectfully submitted,

**WYLD LAW, PLLC**

By    /s/ Kevin T. Wyld
           Kevin T. Wyld
           Texas Bar No. 24099812
           701 Tillery St, Suite 12
           Austin, Texas 78702
           kevintwyld@wyldlaw.com
           737.343.9953 — voice

ATTORNEY FOR PLAINTIFF